UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

OMAR A. TAYLOR,

               Plaintiff,

       -against-

FAMILY RESIDENCES AND ESSENTIAL
ENTERPRISES, INC.,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Civil Action No: 03-6122
(DRH)

**MEMORANDUM & ORDER**

**APPEARANCES:**

**OMAR A. TAYLOR**
Plaintiff Pro Se
32 S. Bedford Avenue
Islandia, NY 11749

**JACKSON LEWIS LLP**
Attorneys for Defendant
58 South Service Road, Suite 410
Melville, New York 11747
By: Kathryn J. Russo, Esq.
     Mark S. Mancher. Esq.

**HURLEY, Senior District Judge:**

       In his complaint, as amended, Plaintiff Omar Taylor ("Plaintiff" or "Taylor") has asserted

claims of race and gender discrimination and retaliation under 42 U.S.C. § 1981 and Title VII of

the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. ("Title VII")**,** as well as a claim under the

Equal Pay Act, 29 U.S.C. §206(d)(1) ( the "EPA") against Defendant Family Residences and

Essential Enterprises, Inc. ("Defendant" or "FREE").   Presently before the Court is Defendant's

motion for summary judgment.  For the reasons set forth below, the motion is granted.[1]

### *Background*

The following facts are taken from Defendant's Statement of Uncontested Facts Pursuant

to Local Rule 56.1 ("Defendant's Statement"), Plaintiff's "Contesting Defendants [sic]

Statements of Uncontested Facts in Opposition to Defendant's Motion for Summary Judgment,"

("Plaintiff's Counterstatement"), and the evidence submitted.  The facts are undisputed unless

otherwise noted.[2]

Plaintiff, a black male, was an employee of Defendant beginning on August 6, 2001.

Defendant is a not-for-profit agency that offers a wide variety of services for persons with mental

illnesses, developmental disabilities and traumatic brain injuries.  Its programs include group

homes, apartments, respite programs, day treatment and vocational programs.  Plaintiff  was

hired by Michelle Flood ("Flood") as a Direct Care Counselor at a rate of $9.00 per hour.[3]  Flood

was a Residential Administrator, responsible for overseeing administration of numerous

---

[1] In response to the motion for summary judgment, Plaintiff withdrew his race discrimination claim asserted pursuant to 42 U.S.C. § 1981.  Accordingly, it is dismissed. Additionally, the following claims, withdrawn by Plaintiff, are also dismissed: (1) the gender discrimination claim relating to his discharge on January 15, 2002 and (2) the retaliation claim concerning his assignment to the Pineway shift.

[2] It should be noted that Defendant served Plaintiff with a Notice to Pro Se Litigants in accordance with Local Rule 56.2.

[3] Other individuals, whose identities are not relevant to this motion, were also involved in the hiring process vis a vis Plaintiff.

residential programs run by FREE.  Robert Budd ("Budd"), Chief Administrative Officer, approved Plaintiff's hire.  Upon commencing employment, Plaintiff was given a copy of FREE's Employee's Handbook.  The handbook specifies that an employee will be paid for accrued but unused vacation when the employee leaves.  It also specifies that "[s]ince paid sick days are to be used when you are ill, unused sick days will not be paid at termination or upon retirement."

Plaintiff initially worked as part of a floating team.  On September 27, 2001 he was assigned to FREE's Parsonage facility and received a pay increase to $9.25 per hour.  At Parsonage, he worked the overnight shift, which was either 12:00 a.m. to 8:00 a.m. or 11:00 p.m. to 7:00 a.m.

In October 2001, Plaintiff and two co-workers, Steve DeRosa and Jessica Regan ("Regan"), had an argument about doing their jobs.  All three individuals were counseled about the necessity of teamwork and getting along.

In January 2002, Regan and another female co-workers alleged that Plaintiff had engaged in sexually harassing behavior.  According to the written statements by these co-workers, the inappropriate behavior included making sexually explicit remarks to them, such as they needed "good black dick" and describing sexual acts he would like to perform.  Also, it was claimed that Plaintiff whistled at one of them and blocked her in the hall and in doorways.  The allegations were investigated by FREE's then Director and Assistant Director of Human Resources, who, based on their investigation, recommended Plaintiff's termination.  Senior management, including Budd, approved the recommendation and Plaintiff was discharged on January 15, 2002. Flood was responsible for communicating the decision to terminate him to the Plaintiff and for

signing his termination memorandum. Plaintiff was advised that he could use FREE's Problem Solving Procedure, set forth in the employee manual, to "appeal" the termination.

Plaintiff did utilize the Problem Solving Procedure. During the procedure, he met with Barry Donowitz ("Donowitz"), the Chief Operating Officer of FREE. Plaintiff did not tell Donowitz that he attributed his termination to race or gender discrimination. Rather he told Donowitz his termination was discriminatory because "they never, ever spoke to me about it . . . My part of the story was never told." Plaintiff also met with Budd. He did not tell Budd his termination was discriminatory, but only complained that he never had a chance to tell his side of the story.[4] Plaintiff told Budd that he did not engage in any inappropriate behavior and that the two female co-workers had fabricated the accusations against him to get him fired. During the meeting Plaintiff became, in Budd's view, quite arrogant and intimidating. When Budd advised Plaintiff his behavior was inappropriate, Plaintiff apologized and said he did not realize his behavior appeared aggressive. Budd pointed out that it was possible that Plaintiff's peers perceived him to be intimidating or aggressive, especially since he is larger and taller than his female co-workers. Plaintiff responded that he had not looked at it that way. After reviewing all the evidence, Budd could not definitively say whether the co-workers or Plaintiff were being truthful. After due consideration, especially in light of Plaintiff's appropriate response to Budd's feedback during the meeting, Budd decided to give Plaintiff a second chance. According to

---

[4] According to Plaintiff, he did complain to Budd about race discrimination when Plaintiff stated that FREE had no minority investigators. *See* Plaintiff's Response to Defendant's Witnesses' Affidavits at 8. However, complaining about the lack of minority investigators does not equate to a complaint that his January termination was discriminatory.

Defendant, Plaintiff was rehired effective February 11, 2002.  According to Plaintiff, his termination was rescinded and he should have been paid for the period January 16, 2002 to February 10, 2002 when he was out of work.  Plaintiff also claims that Flood was upset that Plaintiff was allowed to return to work and was "out to get him."

Plaintiff was advised that upon his return he would not be returning to the Parsonage facility in order to avoid future conflicts with the two female co-workers who had complained about him.  In addition, in an effort to avoid situations where Plaintiff could be subjected to accusations of inappropriate conduct, Budd decided that Plaintiff should not be assigned to work shifts with only one female co-worker.  Rather, Plaintiff could be assigned to work a shift alone or with a male co-worker, or with more than one co-worker (of either gender).[5]

Because he had obtained another job, upon his rehire/reinstatement Plaintiff advised FREE that he was only available to work overnight shifts from 11:00 p.m. to 7:00 a.m.  He could not work the 12:00 a.m. to 8:00 a.m. shift because he would not have enough time to get to his other job which started at 8:15 a.m.   Plaintiff was placed at the Ridge residence where he worked the 11:00 p.m. to 7:00 a.m. shift, full-time, from February 11, 2002 to March 2, 2002.  Defendant claims that Plaintiff's placement at Ridge was only temporary while a permanent

---

[5]  Plaintiff claims that there is no evidence to support that these limitations were placed upon his return.  However, Exhibit 5 submitted by Plaintiff is an email dated February 19, 2002 from Flood to Budd referring to that fact that in rehiring Plaintiff he should not be put in a position where he was at risk for further complaints and therefore should not be placed where he would work with only one female co-worker or where he would be alone on an overnight if there is a female resident in the program.  Indeed, there is no evidence before the Court that creates a factual issue as to the imposition of these limitations.  At best, it appears that perhaps Plaintiff was not informed of the limitations.

placement was found, a claim disputed by Plaintiff. In any event, Plaintiff was then offered an overnight full-time position at the Pineway facility. Plaintiff worked at Pineway on a few occasions but declined the position because the position was the midnight to 8:00 a.m. shift and he could not get to his other job, through which he received medical benefits, on time. Plaintiff did not work any shifts at FREE from March 11, 2002 to March 28, 2002. In late March or early April Plaintiff was offered a 16 hour per week overnight shift at the Wood Road facility from 11:00 p.m. to 7:00 a.m. on Thursday and Friday nights. Plaintiff signed a Request For Change in Hours or Location Form dated April 4, 2002 reflecting this new assignment. Nonetheless Plaintiff claims that this was a demotion resulting in the loss of full-time status and the benefits associated with that status. Plaintiff's title was changed to "Crisis Counselor," the title used for direct care counselors at the Wood Road facility, and his pay increased to $9.50 per hour. Flood avers that she advised Plaintiff's new supervisors of the guidelines set by Budd for Plaintiff's rehire but does not know whether the supervisors ensured compliance with the guidelines.

For the first two months that he worked at Wood Road, Plaintiff worked on Friday and Saturday nights or Thursday and Friday nights. He regularly worked on Thursday and Friday nights from mid-June until the end of August 2002. In August 2002 Plaintiff's rate of pay was increased to $9.79 per hour.

Once Plaintiff began working less than 24 hours per week, he no longer accrued sick or vacation time. Also, FREE does not pay for unused sick days upon termination. Pursuant to this policy, Plaintiff's sick time accruals were eliminated when he became part-time on the theory

that his full-time employment had ceased.  Plaintiff noticed about the end of September or early October 2002 that his accruals had "vanished."  Apparently, Plaintiff's September 22, 2002 pay stub indicated he had accrued 44.28 hours of sick time.  FREE claims this was an error caused by glitches in the computer program that recorded employee's accruals.  The problem was fixed in October 2002, resulting in Plaintiff's pay stub reflecting he had no accrued sick time.  Plaintiff contends that since he was "reinstated" in February 2002, the 44.28 hours shown on the September pay stub was an accurate representation of the sick time he had accrued prior to his reinstatement and when he worked full-time after his reinstatement.  Plaintiff claims the loss of this sick time was improper because the policy does not state that sick time will be lost if an employee goes from full-time to part-time.

FREE requires that all employees in direct care positions attend certain annual training and that if an employee is out of compliance with a required training, he or she is suspended.  Once the employee meets the training requirement, she/he may resume work.  In 2002, the Education and Training Department kept records of all employee training and notified supervisors when employees were due to attend specific trainings   After the supervisor received the notification that an employee was due for training, the supervisor would notify the employee and they would select a convenient training time.  In August 2002, Plaintiff was due to attend mandatory CPR training as well as training in strategies for crisis intervention and prevention.  When Plaintiff had not met both these training requirements, he was suspended on October 3, 2002 until October 14, 2002, when his training was completed.

FREE pays a higher rate to direct care counselors who are willing to work every week on

Friday and Saturday night or Saturdays and Sundays during the day. These employees are referred to as "weekend only" employees. "Weekend only" employees are paid more than other employees because these shifts are the least desirable and the most difficult to fill. In addition, "weekend only" employees are not eligible for benefits, so the higher pay rate is intended to make the shift more attractive. Effective September 2002, FREE paid entry level crisis counselors $9.50 per hour while entry level "weekend only" counselors earned $12.00 per hour. Thursday and Friday are not considered "weekend only" shifts and when a relief worker fills-in for co-workers on Friday and Saturday nights, they are not considered "weekend only" positions.

During the summer of 2002 Jessica Kelly ("Kelly"), a Hispanic female, was employed as a "weekend only" counselor at Wood Road at the rate of $14.00 per hour. Her employment with FREE ended August 31, 2002.

According to Plaintiff, when Kelly left FREE, he advised his supervisor that he was interested in replacing her. The supervisor told him to fill out the paper work necessary for the change. In the meantime, he could begin working the shift and once the change was approved Plaintiff would be paid retroactively for the difference in pay rate. Then in October, after having complained that he was not being paid the same as Kelly and after his sick time accruals disappeared, he put in a second request for the change.

According to Defendant, Plaintiff began covering some of Kelly's shifts in September 2002. Then, in October, Plaintiff advised his Program Director that he would like to be considered for the "weekend only" shift so he could be paid at the higher rate. The Program Director told him to fill out the paperwork, which was done on October 25, 2002.

There is no dispute that the request for the change was approved by the Program Director and Flood but when it was submitted to Budd for approval, it was rejected.

According to Defendant, it was rejected because of the nature of the Wood Road facility and the difficulty in staffing "weekends only" shifts. Consumers placed in Wood Road typically remain there temporarily for intense psychiatric support and evaluation. It is FREE's practice to avoid having male employees assigned (without any female co-workers) to a residence where there are female consumers who may have personal hygiene needs, such as toileting. Although most of the consumers at Wood Road are capable of toileting themselves, there are occasions when female consumers with personal hygiene needs do reside there. In those situations, male employees working there are "swapped" with female employees at other locations until the female consumer with personal hygiene needs no longer resides at Wood Road. Budd felt that it would be difficult to "swap" Plaintiff in such situations for several reasons. First, Plaintiff was unwilling to work in certain geographical locations. Second, the guidelines put in place in February 2002 would limit the potential locations where Plaintiff could be swapped. Finally, there was the general difficulty in staffing "weekend only" overnight shifts. Because of the geographical and other limitations on where Plaintiff could be swapped, Budd claims approving Plaintiff to the position would create staffing problems.

Plaintiff contends that he was denied the position because he is a man. Plaintiff claims he never turned down a shift due to its geographical location. He also claims there is no evidence of the "swapping system." According to Plaintiff, Flood told him that his gender was the reason he

9

was denied the weekend only position.

Although Flood says she did meet with Plaintiff, she denies having told him that his request had been rejected because he is a man. Other male employees have been assigned to the Wood Road facility on a permanent basis.

After Plaintiff's request for the "weekend-only" position was denied in November 2002, he stopped reporting to work and never called to request any shifts. According to Plaintiff, he was given an "ultimatum." He was told he was denied a shift he had already been working because he was a male. He was told that he could continue to work that shift as long as he didn't mind being paid at the lesser non-weekend only rate. "The real problem was not [Plaintiff] working the Wood Road shift it was defendant refusing to properly pay Plaintiff to work at Wood Road."

Plaintiff filed a charge of discrimination with the New York State Division of Human Rights on January 15, 2003. Thereafter, Plaintiff filed his original pro se complaint on December 4, 2003. Defendant answered on February 24, 2004. On March 9, 2005, Plaintiff made his first motion to amend his complaint seeking to add claims of "race discrimination pursuant to section 1981 through 1988 of Title 42 of the United States Code" and "disparate treatment under New York State and Federal Wage and Hours Laws" Defendant opposed the motion. By Order dated March 31, 2006, the Court granted the motion to add his § 1981 claim but denied the motion as to the §§ 1982 to 1988 claims and the unspecified "New York State and Federal Wage and Hours Laws." Plaintiff then moved to amend his complaint so that it asserts claims for gender discrimination, disparate treatment, retaliation, violations of the Equal Pay Act and race

discrimination.  (*See* Plaintiff's Motion to Amend Complaint, Docket No. 68-1 at p. 22.)  By

Memorandum and Order, dated January 31, 2007, the motion to amend was granted (1) as to

Title VII except for the allegations of a preference for females prior to March 2002; (2) as to the

Equal Pay Act only with respect to the allegations regarding Plaintiff's pay vis a vis Ms. Kelly

and (3) as to § 1981 granted regarding the allegations that Plaintiff was being paid less than a

white co-worker and being retaliated against when he complained about his racially

discriminatory pay; but otherwise denied.    Familiarity with the Court's March 31, 2006 and

January 31, 2007 Memorandum and Orders is presumed.

## Discussion

### I.  Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate

where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates both the absence of a genuine issue of material fact and one party's

entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d

712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are

material; "only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party

demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all

inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could

find in the non-movant's favor.  *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d

Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the

substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55.

A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). That being said, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings. *See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also* Fed. R. Civ. P. 56(e). More particularly, although "summary judgment should be used sparingly" in cases where the material fact at issue is the defendant's intent or motivation, the plaintiff must nevertheless offer some "concrete evidence" in his favor, and is "not entitled to a

trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

When a pro se litigant is faced with a motion for summary judgment, the court must "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Camb.*, 174 F.3d 276, 280 (2d Cir. 1999) (citing *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). Nevertheless, the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## II.  Title VII

Having withdrawn certain of his claims, *see* note 1 *supra*, there remains for consideration on this motion both gender discrimination claims and retaliation claims under Title VII. Accordingly, the Court shall address the framework for consideration of the gender discrimination claims and then the retaliation claims.

### A.  Gender Discrimination Claims Generally

 In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-804 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. This

standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-511 (1993).

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

To establish a prima facie case of discrimination, Plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination. *See Williams v. R.H. Connelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for

its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp.2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*, 759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. 2004). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). A discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero*

*v. Warner-Lambert Co.*, 142 F. Supp.2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)), *aff'd*, 9 Fed. Appx. 38 (2d Cir. 2001).

However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

## B. Retaliation Claims Generally

Title VII "forbids an employer to retaliate against an employee for, inter alia, complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-3(a)). Claims of retaliation pursuant to Title VII are also analyzed according to the burden-shifting framework set forth in *McDonnell Douglas*. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).[6]

"In order to present a prima facie case of retaliation under Title VII . . . , a plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find [1] that [ ] he engaged in protected participation or opposition under Title VII . . . , [2] that the employer was aware of this

_____

[6] Retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).

activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'" *Id.* at 205-206 (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)). Once the employee has established a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse action. If it does so, then the burden shifts back to the employee to demonstrate pretext. *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 94-95 (2d Cir. 2001).

### C. Defendant is Entitled to Summary Judgment

With these precepts in mind, the Court shall now examine Plaintiff's Title VII allegations of gender discrimination and retaliation. They are, (1) after March 2002, his supervisor preferred to place female employees in overnight shifts; (2) he was tricked into accepting a demotion to relief worker due to his gender and/or in retaliation for complaining about lost wages, turning down the Pineway shift and because Flood was angry his termination was overturned; (3) Kelly, a female employee, was paid more than he was for performing the same work; (4) he was denied a "weekend" only shift because is he a man; (5) the denial of the "weekend only" shift constituted a constructive discharge; (6) in retaliation for his reinstatement by the Defendant, his refusal to accept the Pineway shift and his complaining about lost wages, he was stripped of his full-time status resulting in his suspension without pay in March 2002; (7) his accrued sick days were taken away in retaliation for his request to be paid as much as Kelly; and (8) his suspension in October 2002 constituted retaliation for complaining that he should be paid as much as Kelly.

### 1. Preference for female employees in overnight shifts.

Defendant is entitled to summary judgment on Plaintiff's claim regarding the alleged

preference for females in overnight shifts.

First, there is no evidence of such a gender-based preference. Defendant has submitted a list of overnight direct care counselors and weekend direct care counselors it employed during 2002-2003. Of the thirteen individuals so employed, seven are male.

Second, Plaintiff has not submitted any evidence that he was adversely affected by any alleged preference. Other than his claim regarding the weekend only shift, which claim is discussed separately below, Plaintiff has not identified other overnight shifts that he applied for and was denied. Plaintiff has failed to establish a prima facie case of discrimination as to this claim.

## 2. The "Demotion" from Full-time to Relief Worker

The uncontroverted evidence establishes that the change of Plaintiff's status from full-time to relief worker was the combined result of Plaintiff's inability to work the midnight to 8 a.m. shift because of his other job (which led to his turning down the full-time position at Pineway facility) and the lack of full-time positions that would fulfill the guidelines under which Plaintiff returned to work. There is no evidence that would permit a trier of fact to infer a discriminatory motive. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997). Plaintiff has submitted no evidence of derogatory gender-based comments or that similarly situated females were treated differently. *See, e.g., Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (stating plaintiff may show that the circumstances surrounding the adverse employment action give rise to an inference of race discrimination by demonstrating that "similarly situated employees of a different race were treated more favorably"); *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004) (holding racist comments may

constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the adverse employment action).  Notwithstanding Plaintiff's assertions to the contrary, Defendant had no obligation to accommodate Plaintiff's other employment responsibilities by either changing established shift hours at a facility or transferring another employee to make available to Plaintiff the shift he desired, and its failure to do so creates no inference of discrimination.  Plaintiff's conclusory assertions of gender discrimination are insufficient to defeat summary judgment.

Defendant is also entitled to summary judgement to the extent that Plaintiff is claiming that he was demoted to relief worker in retaliation for complaining about the wages he lost when he was terminated in January of 2002, turning down the Pineway shift, and because Flood was angry his termination was overturned.  The problem is that, even assuming the truth of these claims, none of these activities constitute protected activities.  While it may be unfair that Plaintiff was punished for complaining that he did not receive the wages he lost when he was terminated "without his side of the story being told" or because he did not want to work a midnight to 8:00 a.m. shift or because Flood was unhappy her termination decision was overturned, Title VII is not a guarantor of fairness.  It is not a court's role to second-guess an employer's personnel decisions, even if foolish or unfair, so long as they are non-discriminatory. *See Seils*, 192 F. Supp.2d at 111.  *See also Montana,* 869 F.2d at 106;  *Dister*, 859 F.2d at 1116. "[U]nfair, overbearing or annoying treatment of an employee, standing alone" does not violate Title VII.  *Porras v. Montefiore Med. Cemter*, 742 F. Supp. 120, 126-27 (S.D.N.Y. 1990).  *See also Bickerstaff v. Vassar*, 196 F.3d 435, 452 (2d Cir. 1999) ("Title VII is not a 'general civility code'"); *Williams v. N.Y. City Dept. of Sanitation*, 2001 WL 1154627, at *15 (S.D.N.Y. Sept. 28,

2001) ("unfair treatment or personal animosity is not actionable, only discriminatory treatment is"); *Lenhoff v. Getty*, 2000 WL 977900 at *6 (S.D.N.Y. July 17, 2000) (even if employer's decision "was mean petty or wrong, that does not make it illegal").

### 3. Kelly's Salary was Higher than Plaintiff's

In order to prove his claim that he was a victim of disparate treatment because Kelly, a white female, was paid more than him Plaintiff must show that he and Kelly were similarly-situated in all material respects. *See McGuiness v. Lincoln Hall*, 263 F.3d 49, 53-55 (2d Cir. 2001 (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *Williams v. British Airways PLC*, 2007 WL 2907426 *12 (E.D.N.Y. Sept. 27, 2007); *Valenzuela v. River Bay Corp.*, 2007 WL 2435161 *6 (S.D.N.Y. Aug. 24, 2007). He has failed to do so.

Kelly's position was as a "weekend only" direct care counselor, i.e., she was to work the Friday and Saturday overnight shifts every week and was paid on a higher salary scale than other direct care counselors because of the difficulty of finding individuals to consistently work those hours. In 2002, entry level "weekend only" counselors started at $12.00 per hour while other entry level counselors started at $9.50. Kelly was paid at the rate of $14.00 per hour when she transferred to the position of "weekend only" counselor in November 2000.

Plaintiff, on the other hand, was a "relief" direct care counselor. His time sheets demonstrate that from late March 2002 to mid-November 2002 he regularly worked Thursday and Friday and only occasionally worked on Friday and Saturday nights. FREE does not consider "relief" workers who fill-in on Friday and Saturday nights to be "weekend only" workers entitled to a higher pay scale. Plaintiff has proffered no evidence that female relief workers who occasionally worked Friday and Saturday were paid at the higher "weekend only"

rate. Defendant, on the other hand, has submitted undisputed evidence that black males who occupied "weekend only" counselor positions were paid at the "weekend only" rate.

Defendant is entitled to summary judgment on this claim.

### 4. Denial of the "Weekend Only" Shift as Discrimination

Plaintiff's claim that the denial of the "Weekend Only" shift was based on his gender must fail because the circumstances surrounding that action do not permit an inference of discrimination. Plaintiff attempts to equate the attitudes and restriction placed upon him as a result of the accusations of sexual harassment leveled against him as relating to gender. [7] However, no such nexus exists. *See Graziano v. New York State Police*, 198 F. Supp.2d 570, 577 (S.D.N.Y. 2002), *aff'd*, 142 Fed. Appx. 5 (2d Cir. 2005) (male employee's status as a purported sexual harasser was not a gender specific classification). It was these non-gender based restrictions, together with privacy concerns for consumers who might have personal hygiene needs, which would have led to staffing problems had Plaintiff been appointed to the "weekend only" shift. Other than conjecture and broad conclusory statements, Plaintiff has presented no evidence that would permit the finder of fact to conclude that circumstances surrounding the decision to deny him the "weekend only" shift permit an inference of discrimination.

---

[7] At his deposition Plaintiff testified that the basis for his claim that he was denied the position for discriminatory reasons was because Defendant had poor impression of him because of the sexual harassment allegations made against him. He further testified that the basis for his claim was also his asking for the position and not receiving it and he was never told he was a bad employee. Pl.'s Dep. at 327-330.

### 5. Denial of the "Weekend Only" Shift as a Constructive Discharge

As the Supreme Court has stated, constructive discharge represents a "'worse case' harassment scenario, harassment ratcheted up to the breaking point." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147-48 (2004). In this Circuit, "[a]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d at 151-52 (and cases cited therein). Constructive discharge requires the employer's intentional conduct and an intolerable level of working conditions. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 229 (2d Cir. 2004). "[W]hether the employer's deliberate actions rendered the employee's work conditions so intolerable as to compel resignation . . . is assessed objectively by reference to a reasonable person in the employee's position. *Id.* at 230.; *Terry v. Ashcroft*, 336 F.3d at 152. Certain conduct is insufficient to support a constructive discharge claim:

> [A] constructive discharge claim cannot be proved by demonstrating that an employee is dissatisfied with work assignments she receives within her job title, *see Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993), or even with the failure to receive an anticipated raise, *see Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993), or a bonus after having received one in previous years, *see Chisolm v. Kidder Peabody Asset Mgmt.*, 966 F. Supp. 218, 228-29 (S.D.N.Y. 1997), it is [therefore] doubtful that a constructive discharge claim can be established by an employee dissatisfied with reduced promotion opportunities, *see, e.g., Neal v. Honeywell, Inc.*, 942 F. Supp. 388, 395 (N.D. Ill. 1996) (rejecting constructive discharge claim by whistleblower dissatisfied with transfer offers because "they were not promotions").

*Petrosino*, 385 F.3d at 230. *See also Chertkova v. Conn. Gen'l Life Ins.* Co., 92 F.3d at 89

("disagreement with management over the quality of an employee's performance will not suffice to establish a constructive discharge");  *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360-61 (2d Cir. 1993) (constructive discharge cannot be established "simply through evidence that an employee was dissatisfied with the nature of his assignments" or because the "employee feels that the quality of his work has been unfairly criticized.")

There is simply no evidence before the Court from which the trier of fact could conclude that a reasonable person would find Plaintiff's working conditions so intolerable, as the result of sexual harassment or actionable retaliation, as to be compelled to resign.  Moreover, plaintiff's submission on this motion makes it apparent that it was not his working conditions but monetary considerations which caused him to leave. *See* Pl.'s Opp. to Defendant's Mem. of Law at 19-20 ("The defendant wants the court to believe that after Plaintiff was denied the weekend only position, Plaintiff tantrumed and quit . . . . The Plaintiff wants the court to realize that there is a big picture. . . . Lets look at the big picture to see what your average person in my shoes would have done after being a victim of so many financial losses. . . .") The constructive discharge claim must fail.

### 6.  Retaliation Resulting in March 2002 Suspension

Plaintiff asserts that in retaliation for his reinstatement by the Defendant, his refusal to accept the Pineway shift and his complaining about lost wages, he was stripped of his full-time status resulting in his suspension without pay in March 2002.  As set forth above, a claim of retaliation requires, *inter alia,* that the Plaintiff engaged in "protected activity." *See* discussion at 16 *supra.*  No such protected activity exists here.

Protected activity has been defined as any activity that opposes unlawful employment

24

practices under Title VII. *See* 42 U.S.C. § 200e-3(a). "[I]n order for an employee's complaints to be a "protected activity" they must relate to an alleged violation of Title VII, i.e., the complaints must relate to race or gender. Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in Title VII even when race or gender was not an issue." *Gourdine v. Cabrini Med. Ctr.*, 307 F. Supp. 2d 587, 598 (S.D.N.Y. 2004), *aff'd in part and vac'd in part and remanded on other grounds*, 128 Fed. Appx. 790 (2d Cir. 2005). *Accord Cruz. v. Coach Stores Inc.*, 202 F.3d 560 (2d Cir. 2000) (protected activity for Title VII retaliation claims "refers to an action taken to protest or oppose statutorily prohibited discrimination").

Here, there is no protected activity on which to base a claim of Title VII retaliation. Plaintiff's refusal to accept the Pineway shift is not a protected under Title VII. That refusal was based on Plaintiff's inability to get to his other employment on time and had nothing to do with gender. Similarly, Plaintiff's complaints about his lost wages was premised on his allegation that he was fired due to the complaints of his co-workers without his side of the story being heard and therefore he should not lose his wages for the period between his firing and his return. Again, his complaints were not concerning gender or other prohibited discrimination. Finally, even if the evidence supported the claim that Plaintiff was suspended in March 2002 because Flood was angry he was reinstated, there is nothing to suggest that alleged anger was a result of other than her authority being undermined or an accused harasser being reinstated. There is nothing to suggest that Flood was aware of discrimination complaints by Plaintiff and therefore no causal connection between any protected activity and the adverse action.

Additionally, there is no evidence to support the claim that Plaintiff was suspended. Other

than conclusory allegations, there is nothing in this record to controvert Defendant's showing that Plaintiff's placement at Ridge was only temporary and that the cause of Plaintiff not working during March 2002 was his turning down the full-time shift at Pineway.

Defendant is entitled to summary judgment on this claim.

### 7. Retaliation for Plaintiff's Request to be Paid as Much as Kelly

Another of Plaintiff's claims is that his sick day accruals were taken away from him in retaliation for his request to be paid as much as Kelly. According to Plaintiff, he was reinstated in February 2002 and therefore his "sick days" should have been reinstated as well. He then earned additional sick days when he worked at the Ridge facility full-time. His accrued sick days then "disappeared" after he complained he was not being paid as much as Kelly.

It is undisputed, however, that beginning April 2002 Plaintiff worked only part-time. It is also undisputed that FREE does not pay its employees for accrued but unused sick days and that part-time employees do not accrue sick time. Viewed against this backdrop, Defendant's uncontroverted evidence that the sick day accruals on Plaintiff's pay stub were the result of a computer problem that was corrected with the first pay period in October 2002 precludes any inference of retaliation. Plaintiff's contention that the computer problem is mere pretext because the employee handbook does not say that accrued unused sick days are lost when an employee goes from full-time to part time does not stand up to analysis. It is implicit in what the handbook does say. As part-time employees do not receive sick time, i.e., do not get paid when they are out sick, there is no reason to permit them to carry over any sick time they may have accrued as a full-timer. Plaintiff has not submitted any evidence that another part-timer was allowed to carry sick-time accrued as a full-timer.

Defendant having articulated a legitimate non-discriminatory reasons for the alleged "elimination" of Plaintiff's sick time accruals and there being no evidence of pretext, Defendant is entitled to summary judgment.

### 8. Plaintiff's October 2002 Suspension as Retaliation

Plaintiff maintains that he was suspended in October 2002 for two weeks in retaliation for complaining that he should be paid as much as Kelly. Defendant answers that all employees in direct care positions are required to attend training; its policy is to suspend an employee that is out of compliance with required training; and, in accordance with this policy Plaintiff was suspended because he was out of compliance with required annual training.

In an apparent effort to show pretext, Plaintiff counters that on October 3, 2002 he "was the only one of out five people not in compliance that was suspended. (See Exhibit 10) all the other people listed on Exhibit 15 page 1 & 2 were still working between October 3, 2002 to October 14, 2002 while Plaintiff was suspended. (See Exhibit 16 pages 3& 4)." Plaintiff's Counterstatement at 11. According to the referenced exhibits in August 2002, the CPR certifications of Plaintiff and four other Wood Road employees had expired. However, there is nothing in the referenced exhibits (or any of the other evidence before this Court) to indicate that any of these four individuals were still out of compliance with training at the time Plaintiff was suspended. Accordingly, there is no evidence of pretext and Defendant is entitled to summary judgment.

In sum, Defendant is entitled to summary judgment on all of Plaintiff's claims of gender discrimination and retaliation under Title VII.

### III. The Equal Pay Act Claim

The Equal Pay Act (" EPA") prohibit employers from paying higher wages to employees of the opposite sex for "equal work on jobs, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions" when the pay differential is due to gender. *Belfi v. Pendergast*, 191 F.3d 129, 136 (2d Cir. 2999) (citing 29 U.S.C. § 206(d)(1)). "To establish a prima facie violation of the EPA, a plaintiff must demonstrate that i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Ryduchowski v. Port Authority of New York & New Jersey,* 203 F.3d 135, 142 (2d Cir. 2000) (internal quotations and citations omitted.). "However, unlike Title VII, the EPA does not require a plaintiff to establish an employer's discriminatory intent." *Id.*

Once a plaintiff has established a prima facie case, the employer has the opportunity to establish that the wage disparity is justified by one of the EPA's four affirmative defenses. These defenses are that the payment is made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system that measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 2069d)(1). After the employer proves an affirmative defense, "the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Ryduchowski*, 203 F.3d at 142 (quoting *Belfi*, 191 F.3d at 136).

Defendant's argument that it is entitled to summary judgment on plaintiff's EPA claim is

twofold.  First, FREE argues that Plaintiff cannot establish that Plaintiff and Kelly performed their jobs under similar working conditions as Plaintiff did not work the overnight shift every Friday and Saturday.  Second, Free argues that the wage differential was based on a consideration other than gender.

Because Plaintiff did work the overnight shift on some Fridays and Saturdays, it seems more appropriate to this Court to address FREE's second argument, i.e., that the wage differential was based on Kelly being a weekend only employee while Plaintiff was a relief worker.

FREE admittedly pays "weekend only" counselors at a higher pay scale than relief workers.  The proffered reason for the differential is that it is harder to find individuals willing to work Friday and Saturday nights every week.  FREE does not extend this higher wage scale to relief counselors who fill-in on weekends.  As further support that the pay differential is not based on gender, FREE points out that other males who were in "weekend only" positions were paid at the weekend only pay rate.

In response, Plaintiff argues that he did commit to work weekends.  The problem with this response is that while Plaintiff may have wanted the "weekend only" position, he did not get it.  And, as discussed earlier in this opinion, the basis for rejections of his application was non-discriminatory.

Defendant having submitted uncontroverted evidence establishing its affirmative defense and there being no evidence of pretext, summary judgment is granted in favor of Defendant on the EPA claim.

***Conclusion***

For the reasons set forth above, Defendant's motion for summary judgment is granted.

The Clerk of Court is directed to serve a copy of this Memorandum and Order upon the Plaintiff

and to close this case.

**SO ORDERED**

Dated: Central Islip, New York
      January 30, 2008

/s/_____
Denis R. Hurley
Senior District Court Judge